# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 25, 2021

Lyle W. Cayce
Clerk

No. 20-10652

John Priest,

*Plaintiff—Appellant*,

*versus*

Logan Grazier; Michael Fenwick,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 2:19-CV-4

Before Ho, Oldham, and Wilson, *Circuit Judges*.

Per Curiam:*

John Priest sued Officers Logan Grazier and Michael Fenwick of the Amarillo Police Department under 42 U.S.C. § 1983. Priest alleges that when Grazier and Fenwick were arresting him, they used excessive force by 1) forcing him onto the ground and then holding him down in broken glass, 2) striking him three times in the back, and 3) kneeing him in the back. When

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 20-10652

they encountered Priest, who was uncommunicative and behaving erratically, Grazier and Fenwick did not know that he was experiencing a diabetic emergency. The district court granted Grazier and Fenwick summary judgment, concluding they were entitled to qualified immunity. Priest appeals, contending that there are genuine disputes of material fact about whether he resisted arrest and whether the officers used excessive force. Finding no genuine dispute of material fact, we AFFIRM.

## I.

Around 11:00 p.m. on January 9, 2017, Officer Grazier was on patrol in Amarillo, Texas. Grazier saw Priest's car stopped in the middle of the road, straddling two lanes, impeding traffic, and with the engine running. Grazier also observed two people walking away from Priest's car. When Grazier pulled his patrol car behind Priest's car, Priest tapped his brakes. Initially, Grazier thought Priest was about to flee. But Priest stopped when Grazier turned on his emergency lights.

Much of what happened next was captured by Grazier's dash cam, which recorded the incident. Grazier exited his patrol car and approached Priest's car. Grazier saw Priest sitting in the driver's seat, sweating profusely, shaking his head, and behaving oddly. Grazier tapped Priest's window, telling Priest to roll down the window or open the door, which was locked. Grazier also saw Priest reach towards his pockets and the gear shift several times.

As Grazier was trying to speak with Priest, Officer Fenwick arrived on the scene. Fenwick tried opening the front passenger's side door, but it was also locked. During this time, Priest did not respond to the officers' entreaties, but he also did not try to flee.

After two minutes of trying to talk to Priest and get him to roll down his window or open his door, Grazier broke the rear driver's side window.

The shattered glass fell onto the ground next to the car. And Priest started rubbing his head and waving his arms even more frantically.

Through the shattered window, Fenwick opened the front driver's side door of Priest's car, unbuckled Priest's seatbelt, and pulled on Priest's right arm to remove him. One of the officers ordered Priest to "get out of the car." Priest's left arm got caught in the seatbelt, and he fell to the ground on top of the broken glass. Attempting to bring him under control, Grazier and Fenwick then placed their weight on Priest, who was face down. As a result, the broken glass on the pavement cut Priest's face.

Fenwick later testified that, in the moment, he did not think about Priest's placement on the pavement. He was focused instead on preventing Priest from "getting away from officers or pulling away from officers. And the quickest and safest way to do that was to [go to] the ground immediately, outside the vehicle." Fenwick also testified that it would have been unsafe to roll Priest away from the glass.

On the ground, Priest kicked his legs and screamed. Though Grazier was able to handcuff Priest's left hand, he had more difficulty controlling Priest's right hand, which for at least part of the time was under Priest (and thus also under the officers' weight). Fenwick struck Priest three times in the back, after which Grazier was able to grasp and handcuff Priest's right hand. Even after being handcuffed, Priest continued to kick his legs and scream. Grazier and Fenwick tried to sit Priest up, but Priest leaned away from Grazier and fell to the right. Grazier then kneed Priest in the back. Shortly thereafter, and for the rest of the encounter, Priest became more subdued.

Grazier and Fenwick noticed that Priest's head was bleeding, and Grazier called for an ambulance. As they waited for the ambulance, Fenwick

retrieved a first-aid kit, and Grazier applied pressure to the cuts on Priest's face.  Then, Fenwick searched Priest and found marijuana in his pockets.

Eventually, paramedics determined that Priest had Type 1 diabetes and that his blood sugar had dropped to a dangerously low level, which explained his odd behavior.  But Grazier and Fenwick did not know any of that when they were arresting Priest.  Indeed, Priest testified that he does not remember interacting with Grazier or Fenwick, or anything at all about the encounter until he woke up in the ambulance.

Two years later, Priest sued Grazier, Fenwick, and the City of Amarillo under 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act of 1973.  The City of Amarillo moved to dismiss the claims against it, and the district court granted this Rule 12(b)(6) motion, leaving Grazier and Fenwick as the sole defendants.

In his remaining § 1983 claims, Priest alleged that Grazier and Fenwick used excessive force by holding him down in broken glass, striking him three times in the back, and kneeing him in the back.  Grazier and Fenwick interposed the defense of qualified immunity and moved for summary judgment.  The district court agreed that Grazier and Fenwick were entitled to qualified immunity and granted their motion.

Priest appeals, challenging summary judgment in favor of Grazier and Fenwick based on qualified immunity.  Priest contends that there are genuine disputes of material fact about whether he actively resisted arrest and whether Grazier and Fenwick used excessive force.  Accordingly, Priest asks that we vacate the summary judgment and remand the case for further proceedings.

No. 20-10652

## II.

We review a summary judgment de novo, "applying the same legal standards as the district court." *Condrey v. SunTrust Bank of Ga.*, 429 F.3d 556, 562 (5th Cir. 2005). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Although we review evidence in the light most favorable to the nonmoving party, we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene." *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) (citing *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)).

Notably, a "qualified immunity defense alters the usual summary judgment burden of proof. Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (citation omitted).

## III.

"Qualified immunity protects government officials from civil liability in their individual capacity to the extent that their conduct does not violate clearly established statutory or constitutional rights." *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (per curiam). It protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

To avoid summary judgment based on qualified immunity, Priest must rebut Grazier's and Fenwick's defense with evidence "(1) that the officer[s] violated a federal statutory or constitutional right and (2) that the unlawfulness of the conduct was 'clearly established at the time.'" *Rich v.*

5

*Palko*, 920 F.3d 288, 294 (5th Cir. 2019) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)).  "We can analyze the prongs in either order or resolve the case on a single prong." *Garcia v. Blevins*, 957 F.3d 596, 600 (5th Cir. 2020) (citing *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019)), *cert. denied*, 141 S. Ct. 1058 (2021).

Priest contends that Grazier and Fenwick violated his Fourth Amendment rights by using excessive force at three discrete points in their encounter: by holding him down in broken glass, striking him three times, and kneeing him in the back.  Further, Priest asserts that in using force as they did, Grazier and Fenwick violated clearly established law because Priest was not resisting arrest when the force was used.

To determine whether force is reasonable, and thus not violative of the Fourth Amendment, or excessive, such that it traverses the Amendment's protections, we consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*  "But an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased." *Lytle v. Bexar County*, 560 F.3d 404, 413 (5th Cir. 2009).

An official violates clearly established law if "at the time of the challenged conduct, . . . every reasonable official would [have understood] that what he is doing violates [the asserted] right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (second alteration in original) (internal quotation marks and citation omitted).  It is not necessary to have "a case directly on point,

but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

It is unnecessary for us to address Priest's argument that the force used by Grazier and Fenwick was excessive under the Fourth Amendment because regardless, Priest fails to show that Grazier and Fenwick violated clearly established law by using force as they did to bring him under control. *See Griggs v. Brewer*, 841 F.3d 308, 315 (5th Cir. 2016) (affirming grant of qualified immunity because "no authority establish[ed] that it was unreasonable for an officer to use non-deadly punches to gain control of the arms of a . . . resisting suspect"). This is so because Priest offers no evidence genuinely to dispute the officers' evidence that they perceived Priest to be resisting arrest when they employed the force at issue. We examine each use of force in turn.

## A.

First, Priest contends that Grazier and Fenwick used excessive force in violation of clearly established law by forcing him onto the pavement and then holding him down in broken glass. When Grazier broke Priest's car window, the shattered glass fell onto the ground next to the car. After being removed from his car, Priest fell to the adjacent ground (and on top of the shattered glass). In their effort to subdue him, Grazier and Fenwick kept Priest on the ground by placing their body weight on him. This caused the broken glass to cut Priest's face.

As regrettable as Priest's injuries are, Grazier and Fenwick are entitled to qualified immunity. In a series of non-precedential but analogous cases, we have held that qualified immunity protects officers who force non-compliant suspects to the ground for handcuffing. *See, e.g., Tennyson v. Villarreal*, 801 F. App'x 295, 296 (5th Cir. 2020) (holding that officers were entitled to qualified immunity as to excessive force claim where they "had to

take [plaintiff] to the ground to handcuff him because of his noncompliance") (per curiam); *Ibarra v. Harris County*, 243 F. App'x 830, 835 (5th Cir. 2007) (holding that officer was entitled to qualified immunity for "forc[ing] [plaintiff] to the ground to handcuff him because he was noncompliant") (per curiam). Here, the dash cam video substantiates Grazier's and Fenwick's testimony that Priest did not comply with their repeated instructions to roll down his window, open his door, and get out of his car. In the face of this non-compliance, Grazier and Fenwick did not violate clearly established law by forcing Priest to the ground to handcuff him.

Priest counters that although Grazier and Fenwick may have been justified in removing him from his car, they were not justified in holding him down in broken glass. Indeed, Grazier and Fenwick both testified that they knew the broken glass was on the ground next to the car. But "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene," *Graham*, 490 U.S. at 396, and Priest offers no evidence that contradicts the record in support of the officers on this score. Fenwick testified that, in the moment, he did not think about Priest's placement on the pavement, focusing instead on preventing Priest from "getting away from officers or pulling away from officers. And the quickest and safest way to do that was to [go to] the ground immediately, outside the vehicle." Moving Priest away from the glass might have allowed him to "break free or injure [himself] or injure any of the officers." Given the dangers involved in moving Priest away from the glass, it was not objectively unreasonable for Grazier and Fenwick to keep Priest on the ground next to the car while they tried to bring him under control.

Priest also counters that because Grazier and Fenwick never felt the need for deadly force, there is a genuine dispute of material fact about whether they needed to hold him down in broken glass. It is true that the officers did not use deadly force; Grazier and Fenwick first verbally

instructed Priest, then broke his window, and then forced him to the ground. By "not immediately resort[ing] to overwhelming force," Grazier and Fenwick used "the type of 'measured and ascending' force . . . that this court has approved." *Defrates v. Podany*, 789 F. App'x 427, 433 (5th Cir. 2019) (quoting *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012)). If anything, far from creating a genuine dispute of material fact, the lack of deadly force further supports Grazier's and Fenwick's qualified immunity. Accordingly, the district court properly determined that Grazier and Fenwick were entitled to qualified immunity for putting Priest on the ground and holding him there.

**B.**

Next, Priest contends that Fenwick used excessive force by striking Priest three times with his hands as the officers continued to try to bring Priest under control. After Grazier and Fenwick pinned Priest to the ground, Grazier handcuffed Priest's left hand "fairly quickly." But Grazier had more difficulty handcuffing Priest's right hand. To free Priest's right hand, Fenwick struck Priest three times in the back. Grazier handcuffed Priest's right hand thereafter.

If the officers reasonably perceived that Priest was resisting being handcuffed at this juncture, Fenwick did not violate clearly established law by striking Priest in the back. *See Griggs*, 841 F.3d at 315. In his deposition, Fenwick testified that Priest "was pulling his hands away from us and refusing to surrender control of his hands." Fenwick further testified that Priest was "resisting . . . and actively preventing us from securing him in handcuffs." Grazier's incident report corroborates Fenwick's account, stating that "Priest continued to roll around on the ground" as the officers "attempted to gain control of his hands." Thus, Fenwick's testimony and Grazier's incident report indicate that Priest was resisting handcuffing.

Priest has no independent recollection of the events. But he contends that "Grazier's dash camera video and Grazier's deposition testimony establish that Priest was not refusing to surrender his hand but was physically unable to move it from underneath his body because the officers were holding him down on top of it." He reasons that this evidence at least gives rise to a fact dispute about whether he continued to resist the officers, such that summary judgment on this particular use of force was improper. But the dash cam video at this instance does not establish anything of the sort; the video only shows Grazier and Fenwick on top of Priest, and they block a clear view of what Priest was doing. Because the dash cam video is at best inconclusive, it does not suffice to create a genuine dispute of material fact regarding Priest's resistance.

Neither does Grazier's deposition testimony. In it, Grazier simply agreed that Priest's right arm "was pinned underneath the body weight of Mr. Priest, [Grazier himself], and Officer Fenwick." Again, this statement does not indicate whether Priest continued to resist handcuffing—something about which Grazier was not asked regarding this specific use of force. And, the statement does not contradict Fenwick's testimony and Grazier's incident report, which both indicate that Priest resisted handcuffing while on the ground. In the absence of competent summary judgment evidence to the contrary, there is no genuine dispute that a reasonable officer could have perceived Priest as resisting at the moment Fenwick struck him three times. And if Priest was resisting, Fenwick's hand strikes did not violate clearly established law. *Griggs*, 841 F.3d at 315. It follows that the district court properly granted Fenwick qualified immunity for striking Priest in the back.

## C.

Finally, Priest contends that Grazier used excessive force by kneeing him in the back after he was handcuffed. Priest asserts that even though he

was cuffed and bleeding profusely, Grazier nonetheless rolled him onto his side and kneed him in the back. But the record clearly, and without any genuine dispute of fact, belies Priest's version of events.

Grazier testified that Priest rolled to his side on his own after Grazier tried sitting Priest up. The dash cam video in fact shows Priest leaning away from Grazier and falling to the right. Grazier also testified that Priest continued to resist arrest even after being handcuffed. Again, the dash cam video shows a handcuffed Priest yelling and kicking his legs. A reasonable officer could have perceived this behavior as resisting arrest. *Cf. Griggs*, 841 F.3d at 314 ("Here, we must conclude that, under the totality of the circumstances—that is, a late-night traffic stop involving a clearly drunk and obstinate individual, lurching to the side . . . would, to a reasonable police officer, amount to resistance to arrest."); *see also Omokaro v. Whitemyer*, 205 F.3d 1338 (5th Cir. 1999) (unpublished) (finding that "a reasonable officer could have perceived his . . . rolling around, screaming and yelling . . . as threatening or resisting arrest in such a way as to demand physical force").

Priest counters that when Grazier kneed him, he was already in handcuffs, on the ground, and blocked in by the car door, Grazier and Fenwick. Priest asserts that, in this position, he did not pose a serious risk of resistance or flight. But as explained above, Priest's contention is based on hindsight logic, not on evidence competent to create a genuine fact dispute. The actual evidence—the dash cam video and Grazier's corresponding testimony—shows Priest behaving in ways a reasonable officer could perceive as resistance. *See Carnaby*, 636 F.3d at 187. In response to this reasonably perceived resistance, Grazier did not violate clearly established law by kneeing Priest in the back. *See Defrates*, 789 F. App'x at 434–35 (affirming qualified immunity for officer who kneed resistant plaintiff). The district court therefore properly granted Grazier summary judgment as to this claim.

No. 20-10652

## IV.

The record demonstrates that Grazier and Fenwick did not violate clearly established law. And by failing to produce evidence sufficient to create a genuine dispute of material fact, Priest did not meet his burden of showing that qualified immunity is inapplicable. Accordingly, we affirm summary judgment in favor of Grazier and Fenwick.

AFFIRMED.